IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

ROSFEL GARZA, #01181215       §

VS.       §       CIVIL ACTION NO. 6:20cv322

LORIE DAVIS, ET AL.       §

REPORT AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE

Plaintiff Rosfel Garza, a prisoner confined at the Coffield Unit within the Texas Department of Criminal Justice (TDCJ), proceeding *pro se* and *in forma pauperis*, filed this civil rights lawsuit complaining of alleged violations of his constitutional rights. The case was referred to the undersigned United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case.

Garza is suing (1) Bobby Lumpkin, TDCJ Director, (2) Kenneth Putnam, former Warden at the Coffield Unit, (3) Pamela Pace, Practice Manager, (4) the University of Texas Medical Branch, and (5) the Texas Commission on Environmental Quality. For reasons explained below, the Court recommends that the lawsuit be dismissed, with prejudice, for the failure to state a claim upon which relief may be granted.

**I. Garza's Amended Complaint—Operative Pleading**

The operative pleading in this lawsuit in Garza's amended complaint, (Dkt. #20). An amended complaint entirely supersedes and takes the place of the original complaint. *See Clark v. Tarrant Cnty., Tex.*, 798 F.2d 736 (5th Cir. 1986). The Court understands that Garza maintains that Defendants acted with deliberate indifference to his health and safety by allowing unsafe drinking water to flourish throughout the Coffield Unit.

Specifically, Garza contends that each Defendant is legally responsible for ensuring that the water at the Coffield Unit is safe and free from bacteria. He argues that from 2012 through 2020 while housed at the Coffield Unit, he has "felt some kind of sickness from water and foods," (Dkt. #20, pg. 6), as the water "caused his body to it[ch] and [sic] red rash on his legs and body" and his stomach "did not feel good." *Id*.

He began seeking help at the University of Texas Medical Branch's (UTMB) unit medical department, explaining to the doctors and providers that "the water caused him to have sickness with stomach pains, and caused rashes on his body." *Id*. Defendants were aware the water as unsafe, as a "ongoing Notice to boil water," existed on the unit.

Beginning in 2016, Garza explains, TDCJ "allowed some plumbing to be installed," but an "unknown toxic capsule was ruptured one hundred yards form the prison well-water." *Id*. at pg. 7. The location of the toxic capsule is between the P-5 dormitory for prisoners and the metal warehouse where prisoners work. He also states that "it was also alleged that in 2016 fecal matter was tested and found in the water" as well as H. Pylori bacteria in 2017.

Furthermore, as a result of his own investigation, Garza contends that the same location has "over [9] lagoons of hog waste water that has no liners under the waste water," thereby causing contamination. Garza explains that his investigation further revealed that "the unit still was using outdated cast iron water plumbing system to supply the prisons water knowing that cast iron for water systems causes health issues." *Id*.

Garza notes that in 2017, his symptoms because of the water began to worsen. He experienced bloating, gas, vomiting, and difficulty sleeping. During a medical appointment, Garza explains that he "would disagree" with the medical diagnosis that would not allow more testing— not even for H. Pylori—and was "removed from different appointments [sic] on provider's

[diagnoses] that were not real M.D. doctors," (Dkt. #20, pg. 7). He notes that he was suffering, and a "provider" remarked that she felt sorry for him and would order laboratory tests that occurred on or about December 15, 2017.

On January 8, 2018, he was "layed-in" for a medical visit wherein the doctor informed him that he tested positive for H. Pylori, which is "a real bad bacteria that's making you sick." *Id*. Garza further explains that on February 6, 2018, his "illness was not good and felt so weak and dizzy," and the provider "refused to test again for H. Pylori" and stated that he has to wait weeks for a referral to see a specialist and declined to prescribe water for health reasons. On February 26, 2018, Garza was "suffering" and saw Dr. Shrode "for several treatments and H. Pylori issues," but "was given misleading information on referral or denied treatments." *Id*.

Subsequently, on March 8, 2018, Garza complained again about his painful symptoms and "sores caused by water," and saw a medical provider. The provider denied him his request for referrals to a specialist for H. Pylori and his leg infection. On March 13, 2018, a different provider examined Garza for his legs and diagnosed him with shingles. *Id*. at pg. 8. Six days later, on March 13, 201[8], he saw another provider who "denied the specialist" and diagnosed him with psoriasis. On April 12, 2018, he received a blood, antigen, and fecal test.

Garza explains that while he awaited a referral to a specialist, he began to take care of his leg infection by keeping it clean and through meditation. He states that he learned "to deal and live with painful effects of unsafe water (H. Pylori)"; however, his condition began to worsen. His leg infection was "open," bad, and painful—prompting him to submit grievance number 2019054955 because he was "already suffering in [sic] unsafe conditions." *Id*. at pg. 8.

On January 8, 2019, he explains that his "leg infection was caused by unsafe water" that now causes pain "everything [sic] he shower." *Id*. Garza then asked to "see a real doctor," and was

3

"lay-ed" in several hours later for his skin infection. The provider "issued some treatment that did not work in any way." *Id*. at pg. 8. Then, on January 15, 2019, Garza needed "medical aid," and saw a provider but the provider denied a referral to see a dermatologist—forcing him to file grievance number 2019064959. Provider Daniel diagnosed him with a bacteria infection and "would try[sic] to treat it, and stated its real bad and denied referral." *Id*. at pg. 9.

Garza also visited Dr. Shrode on "several dates," who questioned his rash and stated that he had "never seen it before, it's serious," and began to quickly treat his leg by cleaning out the infection.  Dr. Shrode applied antibiotic ointment and prescribed several antibiotics—healing the infection within weeks. *Id*. On January 29, 2019, he submitted a prisoner request to the Warden due to the harms caused by the unsafe water, as Garza "needs to review all water results and needs address to [an] independent laboratories to know what kind of test was made."

Turning to March 30, 2020, Garza explains that he "was having a serious issue with bacteria infection that was trying to grow and open back up," and therefore submitted a request for a referral to see a dermatologist. *Id*. He saw a medical provider on April 8, 2020, who explained that there was nothing in his medical records concerning an open infection and then prescribed an antibiotic. Garza insists that he suffered a slow torture and seeks an injunction, safe quality water, and damages.

## II. *Martinez* Report

Pursuant to an order of the Court, the Office of the Attorney General of Texas filed a report, (Dkt. #34) (sealed), addressing Garza's medical claims in accordance with *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978) (citing with approval in *Parker v. Carpenter*, 978 F.2d 190, 191-92 (5th Cir. 1992)). The Report includes Garza's relevant medical records and submitted grievances. The Report also includes a detailed, eleven-page affidavit from Dr. Glenda M. Adams, MD., M.P.H.,

who summarized Garza's complaint, summarized her medical findings, and meticulously outlined Garza's detailed medical care while housed at the Coffield Unit during the relevant period.

The Court has conducted an independent review of Garza's medical records and contained in the *Martinez* Report. The Court has determined that the Report accurately summarizes the contents of Garza's medical records, treatment, and grievances. Garza responded to the *Martinez* Report, (Dkt. #43).

### III. Garza's Medical Records

The Court first notes that Garza does not dispute the accuracy of his medical records submitted. While he argues that portions of his records show deliberate indifference, he does not dispute the contents of his medical records before the Court. As mentioned, Garza claims that the water supplied at the Coffield Unit caused gastrointestinal and skin issues—which illustrates Defendants' deliberate indifference to his health and safety.

A. Complaints Related to Alleged Unsafe Water

On November 18, 2017, Garza submitted a sick-call request (SCR) for H. Pylori testing because "the unit water is not drinkable, something in it has a smell." He specifically sought a blood test for H. Pylori and requested a provider, (Dkt. #34-4, pg. 353). The Coffield Unit Medical Department evaluated Garza on November 21, 2017, wherein Garza complained of "frequent watery stools/diarrhea and abdominal cramps" two to three times per week. He further remarked that "the more water he drinks the worse his episodes of diarrhea are," but did not currently have diarrhea. *Id*. at pg. 357. The Department refers him to a medical provider. *Id*. at pg. 359.

Garza submitted another SCR on December 9, 2017 requesting a test for H. Pylori infection. He explained that he was in pain and "know [it] is due to the unit water." *Id*. at pg. 361. Physician Assistant (PA) Edens evaluated Garza on December 12, 2017, and ordered laboratory

testing—including an H. Pylori antibody test. *Id*. at pg. 364. The laboratory results were reported on December 16, 2017. Garza's H. Pylori test was "positive," which did "not distinguish between past or current infection, or between active infection and colonization." Dkt. #34-4, pg. 374. His thyroid tests revealed significant hypothyroidism. Dr. Coleman counseled Garza on his laboratory results on January 8, 2018, noting that Garza does not take his prescribed medications with consistency. She ordered Garza medications to treat H. Pylori infection—omeprazole, amoxicillin, and metronidazole. *Id*. at pg. 376.

On February 6, 2018, Garza was evaluated in the Medical Department. He specifically requested another H. Pylori test, stating "I just completed treatment for H. Pylori last month, can you run another test and see if it has cleared," and requested "something for gas." *Id*. at pg. 402. Nurse Nwokorie educated Garza on H. Pylori testing, medication compliance, diet, and exercise. She diagnosed him with GERD and prescribed simethicone chewable tablets to take as needed for gas, (Dkt. #34-4, pg. 402).

Garza submitted another SCR on April 6, 2018, seeking a H. Pylori test and a dermatologist referral. Dr. Shrode evaluated Garza on April 12, 2018—who ordered antibiotics, an occlusive dressing, and a fecal H. Pylori test. *Id*. at pg. 425-26. Subsequently, on September 20, 2018, Garza submitted another SCR stating that he needed "to see the doctor because I have the infection H. Pylori and its real painful on my stomach and need medical to provid[e] toilet paoper and need to know when I can take the [treatment] again for H. Pylori because it is painful[l]. Would you please lay me in to see unit Doctor and provider." *Id*. at pg. 455. Prison officials then scheduled an appointment with the provider. *Id*. Nurse Chukwuka evaluated Garza on September 25, 2018. *Id*. at pg. 456. During his appointment, she remarked that his chart revealed past history of H. Pylori

and prescribed medications—omeprazole, amoxicillin, metronidazole, and bismuth—for a possible H. Pylori infection. *Id*. at pg. 456-57.

On January 13, 2019, Garza submitted a SCR request, attributing his skin problems to the water. *Id*. at pg. 478. Specifically, he wrote that he needed a referral to see a dermatologist because "a year ago Doctor Schrode, Paul (MD) treated me for a rare skin infection cause[d] by the unit water, as he was the only doctor that close up and cure this kind of skin infection. But now it came back stronger a year later, and now is infecting the other leg and other parts of the body. I [k]now for a fact that [it] is cause[d] by the water because every time I bath[e] it's painful-burning-itching and the infection gets bigger and ref like a tomato and try to spread out." *Id*. Garza was evaluated in the Coffield Unit's Medical Department via telehealth on January 15, 2019. The notes reveal that he had a pending appointment with the Chronic Care Clinic and an appointment with a provider to determine the need for a dermatology referral. *Id*. at pg. 480.

Garza submitted another SCR on January 15, 2019. He explained that he needed to see a provider because he was "sick to his stomach," that he had H. Pylori in his system, and that when he drinks a lot of water, he gets diarrhea. *Id*. at pg. 484. He was evaluated three days later, wherein he reported "recent bout of abdominal cramps and diarrhea" and "increasing reflux when lying down." *Id*. at pg. 489. Nursing staff referred him to a provider for GERD treatment. That same day, January 18, 2019, PA Comeaux evaluated Garza for (1) his GI complaints, (2) his lower leg lesions, (3) a possible referral to a dermatologist, and (4) renewal of various medical passes. Comeaux noted that his skin rash is exacerbated by hot water and his heartburn/reflux "gradually returned" after prior treatment for H. Pylori infection 1-2 years ago," (Dkt. #34-5, pg. 497).

PA Comeaux renewed his medical passes as requested—and prescribes Zantac, omeprazole for his GERD, two antibiotics, and steroid cream. *Id*. at pg. 498. Comeaux also ordered

a fecal antigen test for H. Pylori. *Id*. at pg. 500. The medical records illustrate that officials within the Laboratory Services Department sent an email notifying Comeaux that Garza missed his scheduled fecal H. Pylori test three times, and that the test would have to be reordered. *Id*. at pg. 503. Nurse Chukwuka evaluated Garza on January 30, 2019, for his GERD symptoms, bloating, and diarrhea. She discontinued his prescription for Zantac but continues the omeprazole—while also adding two antibiotics to his regimen, which Dr. Adams describes as "treatment protocol for H. Pylori infection." *Id*. at pg. 507.

Dr. Wright attempted to evaluate Garza on March 4, 2019. The notes illustrate that Garza "presents to clinic wishing to complain about his living conditions and the security staff. Patient informed to limit our discussion to medical issues. Patient states that he will discuss whatever he chooses and the medical staff will listen or be sued in court," (Dkt. #34-5, pg. 513). Dr. Wright requested that Garza "be calm and conduct himself in civil manner," at which point Garza "stood up and walked out of the exam room without being evaluated." *Id*. at pg. 514. Dr. Wright ordered several laboratory procedures.

Nurse Holmes subsequently evaluated Garza on May 28, 2019, via telehealth. Garza explained that even though he was treated for H. Pylori, he feels bloated and sick—and reports that he has had sores on his legs for two years. She diagnosed him with "bloating/dermatitis," prescribed two steroid creams, ordered abdominal X-rays and a fecal H. Pylori test. *Id*. at pg. 523. On June 5, 2019, Garza tested negative for H. Pylori on June 5, 2019. *Id*. at pg. 527.

Garza continued to complain about his various GERD and leg symptoms throughout the remainder of 2019, attributing his symptoms to H. Pylori. He is seen at UTMB's Gastroenterology (GI) Clinic in Galveston in September 2019. Officials at the clinic diagnosed him with (1) constipation, (2) GERD. *Id*. at pg. 552. He also complained of abdominal pain in January 2020,

requesting treatment for H. Pylori, and was scheduled for an appointment at the GI Clinic via telehealth. Officials diagnosed him and request that prison officials test for H. Pylori or "other diagnosis for extreme gas pains." *Id*. at pg. 575.

Dr. Coleman remarked that he "believes all of his symptoms are due to H. Pylori" but that Garza tested negative for H. Pylori on June 5, 2019.  She noted that because his test was negative, no treatment for H. Pylori was needed. *Id*. at pg. 595.

### B. TDCJ Reports on Water Quality

The *Martinez* Report includes an affidavit from Brian Buster, an Environmental Protection Specialist IV with TDCJ, as well as TDCJ records of water quality testing from 2013 through 2019, (Dkt. #34-7, pg. 664-714). The water source for the Coffield Unit is chlorinated well-water, which is tested daily to ensure portability. The chlorine is a "disinfectant used to control microbes." *Id*. at pg. 670.

Mr. Buster explains that the Texas Commission on Environmental Quality, the Coffield Unit's drinking water has been tested at acceptable limits since September 5, 2017. Specifically, of note, Mr. Buster highlights the following:

> H. Pylori falls into the category of microbial contaminants which the TDCJ-FD tests for monthly; however, TDCJ-FD collects water samples daily to test for chlorine residuals. The water is tested in accordance with Texas Administrative Code 290.101-122. The Texas Commission on Environmental Quality safe drinking water watch website documents monthly microbial testing back to 2012. The total Coliform Rule (TCR) Sample results indicate that water samples are taken at the Coffield Unit T.C. Admin, Back Gate, Housing Life Station, Club House, and Housing 1031. According to the Texas Commission on Environmental Quality[,] the TDCJ Coffield Unit's drinking water has been tested at acceptable limits since September 5, 2017. On September 5, 2017, the sample taken from the Coffield Unit residential housing unit #1031 indicated the presence of coliform bacteria. Under Texas Administrative Code Rule §290.109 if a routine coliform sample returns a positive result, "the public water system must collect a set of repeat distribution coliform samples within 24 hours of being notified of the positive result…." As per the code, subsequent testing was performed on a sample taken on September 7, 2016. This sample indicated that the coliform bacteria was absent.

> On November 1, 2016, a sample was taken from the Coffield Unit backgate and water well #G0010021A tested positive for coliform bacteria. A subsequent sample collected on November 2, 2017 indicated that coliform bacteria was absent for both locations. This was the only time a water sample collected from the Coffield Unit yielded the presence of coliform bacteria during the 2016 calendar year.
>
> . . . .
>
> Attached to this report as Exhibit A are the Annual Drinking Water Quality Reports from the Texas Commission on Environmental Quality from 2013 through 2019. The reports indicate that in 2013, 2014, 2015, and 2016 the TDCJ Coffield Unit water collected produced negative results for E. Coli of Fecal Coliform samples.

Dkt. #34-7, pg. 665-666. He also explains that "total coliforms are a group of related bacteria that are, with few exceptions, not harmful to humans." *Id.* at pg. 665. The United States Environmental Protection Agency (EPA) "considers total coliforms a useful indicator of drinking water contamination from fecal sources and the potential for other pathogens such as H. Pylori to be present"—as "total coliforms are used to determine the adequacy of water treatment and the integrity of the distribution system." *Id*.

## IV. Legal Standards

Under 28 U.S.C. § 1915A, a court shall review any complaint in a civil action wherein a prisoner seeks redress from a governmental entity or officer, or employee of a governmental entity. During its review, the court must identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, or fails to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b)(1).

A complaint is frivolous if it lacks an arguable basis in law or fact. *Samford v. Dretke*, 562 F.3d 674, 678 (5th Cir. 2009). The Fifth Circuit has held that a complaint lacks an arguable basis in fact when "the facts alleged are fantastic or delusional scenarios or the legal theory upon which a complaint relies is indisputably meritless." *Id*. (quoting *Harris v. Hegmann*, 198 F.3d 153, 156 (5th Cir. 1999) (internal quotation marks omitted)). In other words, during the initial screening

under section 1915A, a court may determine that a prisoner's complaint is frivolous if it rests upon delusional scenarios or baseless facts—and dismiss the complaint. *See Henry v. Kerr Cnty., Tex.*, 2016 WL 2344231 *3 (W.D. Tex. May 2, 2016) ("A court may dismiss a claim as factually frivolous only if the facts alleged are clearly baseless, fanciful, fantastic, delusional, or otherwise rise to the level of the irrational or the wholly incredible, regardless of whether there are judicially noticeable facts available to contradict them.") (citing *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992)).

Moreover, a complaint fails to state a claim upon which relief may be granted where it does not allege sufficient facts which, taken as true, state a claim which is plausible on its face and thus does not raise a right to relief above the speculative level. *See Montoya v, FedEx Ground Packaging Sys. Inc.*, 614 F.3d 145, 149 (5th Cir. 2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim has factual plausibility when the pleaded factual content allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged. *See Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 245 (5th Cir. 2010); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This plausibility standard is **not** akin to a probability standard; rather, the plausibility standard requires *more than the mere possibility* that the defendant has acted unlawfully. *Twombly*, 550 U.S. at 556 (emphasis supplied).

Although all well-pleaded facts are taken as true, the district court need not accept true conclusory allegations, unwarranted factual inferences, or legal conclusions. *See Whatley v. Coffin*, 496 F. App'x 414, (5th Cir. 2012) (unpublished) (citing *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)). Crucially, while the federal pleading rules do not require "detailed factual allegations," the rule does "demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading offering "labels and conclusions" or

a "formulaic recitation of the elements of a cause of action" will not suffice, nor does a complaint which provides only naked assertions that are devoid of further factual enhancement. *Id*.

Furthermore, the Fifth Circuit has repeatedly upheld the District Court's use of a *Martinez* Report in which to develop the known facts of a case until it is satisfied that either the claims have merit or they do not:

> Due to the potential abuses by prisoners proceeding *in forma pauperis*, this circuit has given district courts broad discretion in making the determination of whether an *in forma pauperis* complaint is frivolous. As we have noted before, it is not always easy to determine whether a claim is frivolous simply by examining a complaint written by a prisoner unfamiliar with the rules of our courts. Prisoner complaints, more often than not, are difficult to decipher. However, this court has insisted that when it is not apparent from the fact of the complaint whether the prisoner's contentions are frivolous or not, the district court should make an effort to develop the known facts until satisfied that either the claims have merit or they do not. We have suggested that this may be done in a number of ways.

*Parker v. Carpenter*, 978 F.2d 190, 191 (5th Cir. 1992) (citing *Cay v. Estelle*, 789 F.2d 318, 325 (5th Cir. 1986) (internal citations omitted)).  The Fifth Circuit has explained that ordering prison officials to investigate the facts surrounding a prisoner's complaint enables the district court to determine frivolity.  *See Cay*, 789 F.3d at 193, n.2 ("In addition, this circuit cited with approval the procedure developed by the Tenth Circuit: ordering the prison officials to investigate the facts surrounding a civil rights suit by inmates to construct 'an administrative record … to enable the trial court to … make a determination [of frivolity]….'") (citing *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978)).  The Fifth Circuit, in *Cay*, explained that "[e]xpansion of the record protects the unskilled litigant and enables the court to make an informed decision regarding the merits of an action by reference to the reality of the situation rather than by speculating as to the nature of the claim."  *Id*. at 324 (citing *Anderson v. Coughlin*, 700 F.2d 37, 41 (2nd Cir. 1983)).

The Fifth Circuit has continually upheld a district court's reliance on a *Martinez* Report in a prisoner civil rights lawsuit alleging deliberate indifference to serious medical needs. *See Bailey*

*v. Vincent*, 694 F. App'x 283, 284 (5th Cir. 2017) (Mem.) (unpublished) ("Second, although the State raised affirmative defenses in its *Martinez* report, Bailey has shown no error in the district court's reliance on the report, which was otherwise proper under the circumstances.") (citing *Parker*, 978 F.2d at 191 n.2).

This is especially true when there is extensive medical records and Plaintiff's pleadings show his disagreement with treatment provided. *See, e.g.*, *Tijerina v. Stanley*, 804 F. App'x 277, 278 (5th Cir. 2020) (Mem) (unpublished) (affirming finding of frivolity based on *Martinez* Report, finding that "Tijerina's argument that he provided evidence to support his claims, without more, fails to show a nonfrivolous issue challenging the district court's decision that his voluminous medical records established that he received treatment and that he simply disagreed with that treatment."); *Bakre v. Kendall*, 20-40660, 2022 WL 1165649, at *1 (5th Cir. Apr. 20, 2022) (affirming finding of frivolity based on *Martinez* Report, finding that "Bakre received extensive treatment but disagreed with particular aspects of that treatment. Thus, the district court correctly concluded that Bakre failed to meet the extremely difficult standard for showing deliberate indifference to serious medical needs.").

## V. Discussion and Analysis

A liberal review of Garza's amended complaint shows that he is raising claims concerning unsafe conditions of confinement from the Coffield Unit's water supply and deliberate indifference to his serious medical needs—namely, his gastrointestinal and leg symptoms. However, even accepting Garza's claims as true, all of his claims are frivolous and/or fail to state a claim upon which relief may be granted. Garza attributes his medical problems to the water supply at the Coffield Unit; however, he has not shown causation or personal knowledge—as his claims are

wholly speculative. In other words, his insistence that the Coffield Unit's water supply caused his H. Pylori infection, GI symptoms, and leg issues are wholly speculative.

To the extent that he claims that prison officials acted with deliberate indifference to his serious medical issues, his claims—and his voluminous medical records—show nothing more than his disagreement with the extensive and continuous treatment provided to him by the Defendants.

### 1. Conditions of Confinement and the Eighth Amendment

As mentioned, Garza complains that the conditions violate the Eighth Amendment. He complains that prison officials post notices to boil water on the unit and insists—based on his own "investigation" without any supporting documentation—that the unit was built on a toxic waste site accompanied with "hog waste water." He further contends that prisoners at the Coffield Unit have been forced to buy more and more bottled water from the commissary, thereby demonstrating that the water is contaminated. Garza maintains that conditions at the Coffield Unit, as a result of the water, constitutes a "slow torture."

Garza's claims concerning the water at the Coffield Unit sound under the Eighth Amendment. In order to sustain a claim that conditions of confinement violate the Eighth Amendment, a prisoner must meet an objective and a subjective standard. When viewed objectively, the conditions must be serious enough to "deprive [a prisoner] of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Conditions that "cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id.*; *see also Alberti v. Klevenhagen*, 790 F.2d 1220, 1223 (5th Cir. 1986) ("Jail conditions must not fall below a minimum standard of decency required by the Eighth Amendment.").

Exposure to unsafe levels of toxic substances—such as tobacco smoke or asbestos—may suffice as a sufficiently dangerous condition to satisfy this objective component. *See, e.g.*, *Helling*

*v. McKinney*, 509 U.S. 25, 35 (1993) (holding that allegations of deliberate indifference to plaintiff's exposure to tobacco smoke stated a claim under the Eighth Amendment); *Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir. 2016) ("The Amendment encompasses the right to reasonable safety, including protection against unsafe conditions that pose an unreasonable risk of serious damage to [the inmate's] future health.") (internal citations and quotations omitted). In *Helling*, the Supreme Court explained that when evaluating this claim, the court "must assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone unwillingly* to such a risk." 509 U.S. at 36.

Under the subjective component, moreover, the charged officials must act with a sufficiently culpable state of mind. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1981). If the prison officials involved acted with deliberate indifference to the prisoner's health or safety, they may be culpable; however, the deliberate indifference standard is extremely difficult to meet. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *Gobert v. Caldwell*, 463 F.3d 339, 345-46 (5th Cir. 2006). An official acts with deliberate indifference only if he knows prisoner's face a substantial risk of serious bodily harm and he disregards that risk by failing to take measures to abate it. *Gobert*, 463 F.3d at 346. For instance, a prisoner alleging exposure to toxic materials may prevail by showing "that the defendants knew of the health dangers and yet refused to remedy the situation." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d. Cir. 1998).

In a recent case, the Fifth Circuit affirmed the district court's determination that a Texas prisoner's complaints regarding the prison's water supply caused him to contract a H. Pylori infection failed to state a claim. *See Lee v. Davis*, 2023 WL 581639, at *1 (5th Cir. 2023). Much like Garza's claims here, Lee alleged that he contracted H. Pylori "after consuming bad-smelling, dark-colored drinking water in prison and that he experienced strong stomach pain due to the

infection, which persisted after he received treatment. *Id*. The Fifth Circuit reasoned that even if Lee sufficiently alleged facts to show that the contaminated water actually caused his H. Pylori infection, he failed to allege "any facts to show that the defendants were subjectively aware of an excessive risk to inmate health or safety created by the water." *Id*.

Here, as in *Lee*, Garza failed to state facts that would establish both the objective and subjective components required to state such an Eighth Amendment claim. Given the reports on the quality of the water at the Coffield Unit from 2013 through 2019, which show that the water was treated daily with choline and was devoid of any positive H. Pylori bacteria, Garza cannot demonstrate that the Defendants knew of a substantial risk of serious harm and yet refused to act. As Mr. Buster explains, and the records confirm, the water supply at the Coffield Unit has been continuously tested and was "tested at acceptable limits since September 5, 2017," (Dkt. #34-7, pg. 666). While Mr. Buster notes that in 2015 and 2016, water testing revealed coliform bacteria, the results were negative mere days later—and the court notes that coliform bacteria is a different form of bacteria than H. Pylori. Accordingly, even if the water contained coliform bacteria, prison officials treated the water—which was negative for the same bacteria days later.

A review of the reports reveals that at no time between 2013 and 2019 did the Coffield water supply test positive for H. Pylori bacteria, which TDCJ tests for monthly. *Id*. at pg. 665. Dr. Adams explains, with supporting documentation, that the EPA and other organizations have illustrated that H. Pylori is "readily inactivated by free chlorine and should therefore be controlled by disinfection practices normally employed in the treatment of drinking water," (Dkt. #34-1, pg. 11). Mr. Buster highlights that TDCJ uses chlorine residuals to disinfect the water and kill bacteria. Again, the quality reports confirm that the Coffield Unit water is routinely treated with chlorine—

refuting any claim that prison officials "refused to remedy" toxic water levels that may have existed.

Garza responds by stating that he "would like to thank Brian Buster for helping Plaintiff in showing Plaintiff has been exposed to H. Pylori through the H.H. Coffield Water," (Dkt. #43, pg. 2), which is neither reflected in Mr. Buster's affidavit nor the records of water quality. Contrary to Garza's contention, simply because two tests revealed coliform bacteria in 2015 and 2016 does not mean that the water contained H. Pylori bacteria. Coliform and H. Pylori are two different types of bacteria. While Mr. Buster remarked that the EPA considers total coliform a "useful indicator of drinking water contamination from source and the potential for other pathogens such as H. Pylori to be present," such statement does not illustrate or indicate that H. Pylori was actually found in the water supply. As mentioned, to the contrary, the water quality reports from 2013 through 2019 are devoid of any positive H. Pylori tests. Garza's personal belief that the water is contaminated, without more, is insufficient to support a claim.

The fundamental flaws with Garza's complaint are lack of causation and the speculative nature of his contentions. Laboratory results demonstrate that Garza tested positive for H. Pylori infection one time in December 2017. Dr. Adams explains that this infection from the antibody test indicated either a past or present H. Pylori infection or colonization—further describing the infection "as exposure to H. Pylori at some point in his life but not necessarily a current infection or colonization," (Dkt. #34-1, pg. 9). In fact, Dr. Adams reports that Garza's symptoms at the time—nausea after drinking water, alternating constipation and diarrhea, polyuria, and polydipsia—are not the typical symptoms of H. Pylori infection such as upper abdominal burning pain. *Id*. Nonetheless, Garza was treated multiple times in 2018 and 2019 for possible H. Pylori infection given his complaints and he tested negative for H. Pylori was in 2019. Given that Garza's

single positive test illustrated either a past or current infection, his claim that his positive test was a result of the water supply at the Coffield Unit is insufficient to support a claim. *See Rougley v. GEO Group*, 2011 WL 7796488, at *3 (W.D. La. Nov. 7, 2011) ("The Plaintiff has offered nothing other than conclusory allegations concerning the cause of his alleged staph and E. Coli infections, including his claim that such infections were caused by the food served to the inmates in administrative segregation.").

Moreover, Garza insists that the Coffield Unit sits upon a "toxic waste site" with "Hog waste" as reported by "news and radio." Such is pure speculation and conclusions. As outlined above, a district court is not required to accept as true delusional scenarios, fanciful facts, or baseless innuendos. *Denton*, 504 U.S. at 32-33.

Garza explains in his initial complaint that he conducted "his own investigation" revealed that the Unit's pipes are made of cast iron that "makes water with [odor], brown in color," demonstrating that the plumbing system "has all the elements/are facts that the location is at a toxic waste site." (Dkt. #20, pg. 6). On the one hand, Garza claims that the alleged cast-iron pipes cause the water to have an odor, but also claims that the odor is because of H. Pylori. He offers nothing beyond speculation to show that his single positive test for H. Pylori in 2016—which could have been from a past or present infection—was the result of the water supply at the Coffield Unit.

Garza's speculation continues with his claim concerning "an unknown toxic capsule" that allegedly ruptured. He states, again, without any support, that in 2016 TDCJ Administration installed plumbing, but that "an unknown toxic capsule [sic] ruptured one hundred yards from the prison well-water, (Dkt. #20, pg. 8). Garza remarks that the location of this "capsule" is in between a prisoner dormitory and the metal warehouse and that "it was also alleged" that fecal matter was found and H. Pylori was "found in the water." His statement that "it was also alleged," is hearsay

and without methodology, again, is a conclusion. As mentioned, the reports on water quality from 2013-2019 are devoid of any positive tests for H. Pylori. Consequently, Garza offers nothing beyond pure speculation and conjecture that his H. Pylori and leg infections stemmed from the water.

Similarly, Garza maintains that prisoners at the Coffield Unit were forced to buy more and more bottled water from the commissary because H. Pylori exists in the water, as he asserts that "H. Pylori is the answer," (Dkt. # 43, pg. 4). He also contends that the water must be infected because prison officials post "boil water" notices at the prison. Such arguments fail, however, because they evince the logical fallacy of *post hoc ergo proper hoc*—"after this, therefore because of this." *See e.g.*, *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) (noting that "the *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence," which is "a false inference."); *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) (explaining that "temporal proximity is insufficient to prove 'but for' causation.").

Dr. Adams reports that approximately 50 percent of the world's population is infected with H. Pylori. While contaminated water is one way H. Pylori can be contracted, the mechanism of exposure is not well-known; there are many ways to contract the bacteria. Dr. Adams highlights that the most common mode of infection is believed to be person-to-person transmission and offers the following illustration:



Dkt. #34-1, pg. 11.

The prevalence of H. Pylori in the general population—and given that some people experience no symptoms—render it difficult to identify the source of exposure in infected persons who may have had the bacteria for a substantial amount of time, even years, before being diagnosed. In this way, given the Coffield Unit's water-quality reports provided in this case coupled with the prevalence of H. Pylori in the general population, Garza's water complaints are not "so grave that it violates contemporary standards of decency" to expose anyone unwillingly to such a risk. Citizens throughout the country are routinely advised to boil water; in other words, Garza's complaints are not limited to those who are imprisoned.

Garza offers nothing other than pure speculation and *post hoc* rationalizations to claim that the water caused his H. Pylori infection or his skin symptoms. *See, e.g.*, *Wright v. NY State Dep't. Corr. Servs.*, 2008 WL 5055660, at *11 (S.D. NY Oct. 10, 2008) ("In the fact of this evidence, Plaintiff only raises conjecture and speculation about the presence of bacteria or parasites in Green Haven's water."), *aff'd* 372 F. App'x 175, 176 (2d. Cir. Apr. 20, 2010) ("Appellant presented no evidence form which a jury could conclude that the drinking water at Green Haven was contaminated with Helicobacter pylori, nor that prison officials were deliberately indifferent to the water quality or his medical needs."). His claim concerning water and the conditions of his confinement at the Coffield Unit should be dismissed for the failure to state a claim upon which relief may be granted.

2. Deliberate Indifference to Serious Medical Needs

To the extent that Garza insists that Defendants acted with deliberate indifference to his serious medical needs, namely his gastrointestinal and leg issues, he likewise fails to state a claim

20

upon which relief may be granted. Garza's extensive and voluminous medical records refute any claim of deliberate indifference.

Deliberate indifference to a prisoner's serious medical needs constitutes an Eighth Amendment violation and states a cause of action under section 1983. *See Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989). In *Farmer*, 511 U.S. at 837, the Supreme Court noted that deliberate indifference involves more than mere negligence. The Court concluded that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; . . . the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id*. at 837.

The Fifth Circuit has discussed the high standard involved in demonstrating deliberate indifference as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id*. Furthermore, the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.

*Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). In the medical care context, "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does an inmate's disagreement with his medical treatment, absent exceptional circumstances." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). Moreover, "medical records of sick calls, examinations, diagnosis, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41F.3d 232, 235 (5th

Cir. 1995) (affirming the district court's summary dismissal of Banuelos's lawsuit based on his medical records rebutting his claim of medical deliberate indifference).

Here, Garza's voluminous medical records during the time period about which he complains confirm Dr. Adams's summary: He received extensive medical treatment from medical personnel at the Coffield Unit. Garza's complaints reveal nothing more than his disagreement or dissatisfaction with how he was treated. The record, however, does not indicate or show that Defendants refused to treat him, ignored his complaints, intentionally mistreated him, or evinced a wanton disregard for his medical needs. *See McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) ("Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind.").

It is well-settled that mere disagreement with a course of treatment or dissatisfaction with medical treatment does not constitute deliberate indifference under the Eighth Amendment. *See Gobert*, 463 F.3d at 346; *see also Blank v. Bell*, 634 F. App'x 445, 448 (5th Cir. 2016) ("Blank's desire to see Dr. Sandknop more often amounts to a disagreement over his treatment, which, as discussed *supra*, does not rise to the level of deliberate indifference."). Indeed, Garza's complaint that prison officials "did only bandaid [sic] the problem, (Dkt. #43, pg. 7), illustrates his disagreement with the medical care provided. The *Martinez* Report reflects that Garza received a quantum of medical care consistently for years—as he was evaluated, treated, prescribed medicine and creams, given extra toilet paper, visited GI specialists, and tested several times when he complained of a possible H. Pylori infection. In other words, Garza's claim of deliberate indifference to his serious medical needs is refuted by the record.

To the extent that Garza insists that he should have been sent to a specialist sooner—or that prison officials should have "the water tested every day for 90 days," (Dkt. #43, pg. 7)—such

claims do not constitute deliberate indifference. *See, e.g.*, *Estelle*, 429 U.S. at 107 ("But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a class example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."); *Trujillo v. Arce*, 109 F. App'x 668, 670 (5th Cir. 2004) (unpublished) ("Arce's decision to continue treating the pain with medication and monitoring Trujillo's progress rather than to refer him to a specialist shows only a difference of opinion as to the proper course of treatment," which does not demonstrate a constitutional violation).

The Court would be remiss if it failed to address the Fifth Circuit's opinion in *Davis v. Lumpkin*, case number 19-20873. In *Davis*, the Fifth Circuit reversed and vacated, in part, the district court's use of a *Martinez* Report in finding that a *pro se* plaintiff's claims of medical deliberate indifference were frivolous. Davis alleged an officer at the Polunsky Unit applied "an unwarranted use of force" against him and intentionally fractured his foot and ankle.

He also alleged that the subsequent failure to treat him and the delay in treatment occurred because prison staff intentionally misdiagnosed him as a cover-up scheme to protect the officers who caused the injury. The Fifth Circuit ultimately found that the medical records could not resolve Davis's contentions that he was treated incorrectly or that his injury was ignored because prison officials intentionally pursed a cover-up scheme. In other words, the Fifth Circuit determined that medical records could not resolve Davis's claims of an intentional delay and/or purposeful incorrect mistreatment because of a cover-up scheme. *See Davis v. Lumpkin*, 2022 WL 1791945, at \*1-4 (5th Cir. June 2, 2022) (holding that "[w]e conclude that if the *Martinez* report conflicts with the pro se plaintiff's allegations, the district court must accept the plaintiff's allegations as true, not the records in the report.").

Here, Garza's allegations are factually distinct and distinguishable from the allegations raised in *Davis*. While Davis alleged that treatment to his injury—an injury stemming from a use-of-force—was intentionally delayed and inadequate because it was part of a cover-up scheme, Garza implies that Defendants outright refused to treat him and refused to send him to a dermatologist or specialist sooner—which is patently refuted by the records. The Fifth Circuit has squarely held that medical records can refute allegations of deliberate indifference. *See Banuelos*, 41 F.3d at 235 (affirming the district court's summary dismissal of Banuelos's lawsuit based on his medical records rebutting his claim of medical deliberate indifference). This holding has been reaffirmed in other cases involving *Martinez* Reports. *See, e.g.*, *Tijerina*, 804 F. App'x 277, 278 (5th Cir. 2020) (Mem) (unpublished); *Bakre*, 20-40660, 2022 WL 1165649, at *1 (5th Cir. Apr. 20, 2022).

The record in the present case plainly demonstrates that Gaza received a significant quantum of medical care and refutes any claim of deliberate indifference to his serious medical needs. *See Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999). Unlike the allegations raised in *Davis*, here, Garza's claims—failure to treat, merely placing a "Band-Aid" on his issues, refusal to transport him to a hospital, disagreement with diagnostic tests, and how his medical issues persist—can be resolved through the medical records denoting extensive treatment. Additionally, while Garza maintains that Defendants acted with deliberate indifference, he does not dispute the accuracy of the medical records provided. His claims should be dismissed.

<u>RECOMMENDATION</u>

For reasons explained, it is recommended that Plaintiff Garza's civil rights lawsuit be dismissed, with prejudice, for the failure to state a claim upon which relief may be granted.

Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**So ORDERED and SIGNED this 22nd day of February, 2023.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE